**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| BONNIE S. RAMSDELL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 1:12-cv-233-GZS |
| | ) | |
| HUHTAMAKI, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Huhtamaki, Inc.'s ("Huhtamaki") Motion for Summary Judgment (ECF No. 39). The Motion has been fully briefed in accordance with the Court's May 26, 2013 Order & Report of Conference (ECF No. 26). For the reasons stated herein, the Court GRANTS IN PART & DENIES IN PART the Motion.

## I.  LEGAL STANDARD

A party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. <u>Santoni v. Potter</u>, 369 F.3d 594, 598 (1st Cir. 2004

Nonetheless, once the moving party has made its preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." <u>Triangle Trading Co. v. Robroy Indus., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); <u>see</u> <u>also</u> Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." <u>Barros-Villahermosa v. United States</u>, 642 F.3d 56, 58 (1st Cir. 2011) (internal citations and quotations omitted); <u>see also</u> <u>Wilson v. Moulison N. Corp.</u>, 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (internal citations omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." <u>In re Spigel</u>, 260 F.3d 27, 31 (1st Cir. 2001) (quoting <u>In re Ralar Distribs., Inc.</u>, 4 F.3d 62, 67 (1st Cir. 1993)). Generally, "[i]n retaliation cases, where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests only upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Alvarado v. Donahoe</u>, 687 F.3d 453, 458 (1st Cir. 2012) (citations omitted).

## II.    FACTUAL BACKGROUND

Having reviewed the statements of material fact and supporting exhibits in accordance with Local Rule 56, the Court constructs the following narrative from the undisputed facts as well as the disputed material facts viewed in the light most favorable to the non-movant, in this case, Ramsdell:

Huhtamaki manufactures consumer and specialty packaging at its facility in Waterville, Maine. (Joint Stipulated Facts (ECF No. 37) ("JSF") ¶2.) Huhtamaki's Employee Handbook contains its anti-harassment policies, together with a procedure that employees can use to report any perceived harassment or retaliation.   (Statement of Material Facts (ECF No. 40) ("SMF") ¶1.)  Huhtamaki also requires all employees to attend bi-annual training sessions on harassment. (SMF ¶2.)

Huhtamaki is party to a collective bargaining agreement (the "CBA") with the United Steel Workers, Local 449 (the "Union"), which covers a majority of Huhtamaki's employees, including employees working in the Stacker Operator position. (JSF ¶5.)  Pursuant to the CBA, Stacker Operators regularly have opportunities to work overtime, and are offered the opportunity in order of seniority.   (JSF ¶9.)   The CBA also requires that Stacker Operators be offered an opportunity to bid on new shifts based on seniority each November. (JSF ¶8.)  Generally, Stacker Operators work three (3) twelve-hour shifts (6 a.m. to 6 p.m. or 6 p.m. to 6 a.m.) for three (3) consecutive days, and then have three (3) consecutive days off.   There are four shifts of Stacker Operators, A, B, C, and D. Employees who work on the A-shift and B-shift work during the same three (3) days of the week, and relieve one another at 6 a.m. and 6 p.m. The same is true for employees who work on the C-shift and D-shift.

Ramsdell, who was employed as a Stacker Operator at Huhtamaki from April 19, 2004 until her February 18, 2010 suspension, received a copy of the Employee Handbook and was aware that Huhtamaki had anti-harassment and anti-retaliation policies. (JSF ¶¶2-4; SMF ¶56). As a Stacker Operator in Huhtamaki's Rough Finish Department, Ramsdell took newly-created products and stacked the products into boxes for shipping. (JSF ¶2.) Ramsdell believed she was an "outcast" from the time she began working at Huhtamaki because she was a "new person." (SMF ¶4.)

## A. Ramsdell's 2004 Harassment Complaints Culminating in the Walter Investigation

Most of the torment Ramsdell alleges she endured began in August of 2004 after she reported co-worker Scott Ottis ("Ottis") to representatives of the Union for swearing at her and for throwing and breaking brooms near her. (Id. ¶5; Statement of Material Facts in Support of Pl. Obj. to Mot. for Summary Judgment (ECF No. 48) ("PSMF") ¶5; Def. Reply to Pl. Statement of Additional Facts (ECF No. 54) ("Reply SMF") ¶80). Upon reporting Ottis, co-worker Ron Poulin ("Poulin") and some members of their clique began tormenting her. (Ramsdell Deposition Volume II (ECF No. 35) ("Ramsdell Dep. II") at 267:22-21 – 268:1-2).

On August 6, 2004, Ramsdell reported to Huhtamaki's acting Human Resources Representative Paul Baker ("Baker"), that she was being sexually harassed by Poulin and Ottis.[1] (PSMF ¶75.) Without providing any additional background, Ramsdell reported that Poulin remarked to a co-worker, "I'll just tell everyone to kiss my fucking ass, including Bonnie," and that Poulin made the following announcement over the mill's public address system, "My vagina

---

[1] Because Huhtamaki maintains Ramsdell's claims are untimely, Huhtamaki objects to any allegations referencing events prior to February 18, 2010 and argues they should be stricken. Reply SMF ¶75. The Court addresses this legal argument in the discussion section but nonetheless describes the events that occurred prior to February 18, 2010 in the context of construing the entirety of the factual record in the light most favorable to Plaintiff.

hurts, I want to go home." Id. Ramsdell told Baker that when she asked Ottis to assist clearing jams on her machine, he made several angry statements and gestures to her all using the word "fuck."[2] Id. On or about August 6, 2004, Baker, Rough Finish Department Manager Joe Rapp ("Rapp"), and Union President Joe Barney ("Barney"), met with Poulin and discussed Ramsdell's allegations. (JSF ¶11.) Poulin denied the complained-of conduct. (Id.) Nonetheless, Baker directed Poulin to immediately cease any inappropriate conduct and warned him that any retaliation would be grounds for immediate termination. (Id.)

On October 5, 2004, Ramsdell reported that Poulin approached her at her workstation; while pointing at Ramsdell, Poulin said to a male co-worker, "Fuck her, fuck her, fuck her."[3] (PSMF ¶77.) Poulin repeated this at least six times.[4] Id. On October 6, 2004, Poulin complained to supervisor Jeff Owens ("Owens") that Ramsdell jumped away when Poulin walked behind her on the stacker line. (SMF ¶6.) Poulin reported that he asked Ramsdell if she had a problem with him; Ramsdell stated that she did, in fact, have a problem with him, and she wanted Poulin to walk around the stacker machines instead of behind her. (SMF ¶6.) When brought in to discuss the incident, Ramsdell reported to Owens and union shop steward Bill Lawler ("Lawler") that Poulin was repeatedly approaching her from behind while she was on the line – eight to ten times per shift. (PSMF ¶78; Ramsdell Dep. II at 259:10-19.) On that particular day, Ramsdell said she had asked Poulin to not walk behind her and he responded, "I'll take care of this fucking problem right now." (PSMF 81; Ramsdell Dep. II at 260:1-5.) Ramsdell told Owens and Lawler that

---

[2] Huhtamaki does not dispute Ramsdell made these allegations, but adds that Ramsdell also reported another male co-worker and four female co-workers for harassment. Reply SMF ¶75.

[3] The Court notes that although Plaintiff asserts she made this report to Baker, she also stipulated that Paul Baker separated from Huhtamaki on or about September 21, 2004. JSF ¶12 & PSMF ¶77.

[4] Huhtamaki does not dispute that Ramsdell made this allegation but qualifies this incident and the October 6th, 8th, and 12th incidents, noting that in October of 2004, Human Resources Manager Nina Walters ("Walters") investigated Ramsdell's complaints, issued Poulin a written warning, and required him to participate in the training detailed below. Reply SMF ¶77.

Poulin would stand directly behind her with his hands cupped as if he would hold onto her rear end if she backed up. (PSMF ¶78.) Ramsdell reported that on one occasion (nearly a month before) she had stepped back, Poulin moved into her with both of his hands cupped near her rear end, and Ramsdell "felt him move his privates right up against my rear end." (Id.; SMF ¶7; Reply SMF ¶78.) Ramsdell said she was terrified of Poulin, that he would not leave her alone, and that she had previously been to the Union about these matters. (PSMF ¶79.)

On October 8, 2004, Ramsdell, Giguere, Rapp, Joe Barney ("Barney"), Michelle Johnson ("Johnson") and Ann Poehler ("Poehler") participated in a meeting at the Huhtamaki Human Resources office. (PSMF ¶84.) Ramsdell reported that Poulin would swear at her and walk behind her on the line where he could make derogatory gestures that she could not see. (PSMF ¶10.) On one occasion while Ramsdell was sitting in the mill lunchroom, Poulin remarked to a co-worker, "Look at her pursed lips, they are pursed just like her vagina." (Id.; Ex. D to Bates' Investigation (ECF No. 40-5) ("Exhibit D") at Page ID #725). Ramsdell also related that co-worker Mitch Moberly ("Moberly") had previously crossed behind her and rubbed up against her backside. (Id. at ¶84.) Ramsdell reported that Daniel Pooler ("Pooler"), a former Union official, approached her and called her a troublemaker and that co-worker Linda Arnett ("Arnett"), yelled and swore at Ramsdell for reporting her co-workers' conduct. (Id.)

In October of 2004, Ramsdell moved to another shift so that she and Poulin would not work on the same scheduled shift. (SMF ¶15.) That same month, Huhtamaki agreed to pay Poulin or Ramsdell to stay at home when either could have taken overtime hours to avoid having them work on the same shift. (Id. ¶16.) Huhtamaki also allowed Poulin and Ramsdell to leave early or arrive late to avoid having them at the facility at the same time. (Id.)

On October 12, 2004, Ramsdell told Human Resources Manager Nina Walters ("Walters") that Poulin was coming up behind her and touching her buttocks.[5] (PSMF ¶81.) Ramsdell reported that Poulin had made a large penis out of tape, passed it up and down the assembly line, and said it was a birthday present for co-worker Jeannie O'Keefe ("O'Keefe").[6] (Id. ¶82.) Ramsdell recounted that Poulin, while standing right beside her, told his nephew, Jared Poulin, "She wants you to stick it in her, stick it in her hard." (Id.) Ramsdell told Walters that she had previously reported these incidents to Timothy Giguere ("Giguere"), Ken Saunders ("Saunders"), Lawler, and Rapp. (Id. ¶83.)

Walter issued a report of her investigation regarding Ramsdell's harassment complaints on October 21, 2004. As indicated in that report, Walters recommended that Poulin and Ramsdell continue to work separate shifts. (Fact Finding Report (ECF No. 28-4).) Additionally, as a result of Walters' investigation, Huhtamaki issued Poulin a written warning on October 22, 2004, and required him to attend both harassment training and sensitivity training through the company's Employee Assistance Program. (SMF ¶11.) Ramsdell was satisfied with the Walters' investigation. (SMF ¶12.) On October 21, 2004, Ramsdell signed Walter's Fact Finding Report, which indicated that she was "satisfied with the recommended action." (Reply SMF ¶77.) Following Walters' investigation, Poulin never touched Ramsdell or engaged in any conduct of a sexual nature towards her, yet Ramsdell believed she was ostracized after turning him in. (SMF ¶¶13 & 17.) Poulin completed all of his obligations under the written warning by April 2005. (SMF ¶14.)

---

[5] Huhtamaki denies that Ramsdell reported the "buttocks-touching incident" occurred multiple times; rather, Huhtamaki maintains Ramsdell indicated that only once did Poulin move into her when she backed up. Reply SMF ¶81.

[6] Huhtamaki denies this allegation, arguing that the documentation from Walter's investigation demonstrates that Ramsdell did not make this complaint. Reply SMF ¶81. However, the Court's review of Walter's investigation notes adequately describes the "assembly line penis" incident. See Exhibit D at Page ID #722, 725.

## B. Ramsdell's Post-Walters Investigation Complaints

From October 2004 to August 2005, Ramsdell reported that the "first hands" – employees assisting with line problems and maintenance – refused to clear jams from her stacking machine. She encountered these difficulties after reporting Poulin's sexual harassment.[7] (PSMF ¶85.) According to Ramsdell, after that, she was considered to be a "Huhtamaki rat" and people at work "did not like her."[8] (Id. & SMF ¶22.) Ramsdell acknowledges throughout her tenure at the mill that she made complaints both to the Union and Huhtamaki against a variety of her co-workers about a number of issues, including inappropriate language and minor rule violations. (SMF ¶22 & 24.) Ramsdell also asserts that at various times during her tenure co-workers warned her not to make reports to Human Resources. (SMF ¶21.)

On or about July 15, 2005, Beth Drennen-Bates ("Bates") was hired as the new Human Resources Manager at Huhtamaki's Waterville facility. (SMF ¶18.) While Bates was generally aware that Ramsdell had made a complaint against Poulin in 2004, she was unaware of the "sexually inappropriate" details of that 2004 complaint while dealing with Ramsdell's later complaints. (PSMF ¶20; Bates Dep. (ECF No. 28-11) at 51-54.) Nonetheless, from 2006 through 2009, Ramsdell reported certain co-workers' purported misconduct to Bates. (Id. ¶19.)

---

[7] Huhtamaki argues that the record citation does not support Ramsdell's characterization that she reported this issue to her supervisors and union reps. SMF ¶85. Rather, Huhtamaki claims the citation only reflects that Ramsdell reported to Giguere that the first hands refused to fix her stackers because she was considered the Huhtamaki rat, and that she told supervisor Todd Heald ("Heald") that the first hands would not fix her stacker. Id. Upon reviewing the record citation, the Court is inclined to agree with Huhtamaki's limiting construction concerning who received reports from Ramsdell. However, for purposes of summary judgment, this factual nuance is not material. Additionally, Huhtamaki notes that Giguere did not recall Ramsdell reporting any difficulty between 2005 and 2010 with getting first hands to fix her stackers. SMF at ¶¶85 & 96. However, this qualification shows only that there is some differing testimony as to when and how Ramsdell made reports between 2005 and 2010.

[8] Ramsdell never heard anyone specifically call her a "Huhtamaki rat" or saw that term in writing referencing her. PSMF ¶85 & SMF ¶27. To that end, Giguere never heard the phrase "Huhtamaki rat," and co-workers Amber Douglas ("Douglas") and Cheryl Schenks ("Schenks") never heard that phrase used at the facility. PSMF ¶85.

Ramsdell believed these co-workers were part of Poulin's clique of friends. (Id.) According to Bates, Ramsdell "never used the word retaliation" in her complaints to Bates but did frequently reference Poulin as part of the complaint. (Reply SMF ¶ 86; Bates Dep. at 63, 70, 85-86.) Specifically, in the Fall of 2005, Ramsdell reported to Bates, Barney, and Giguere that co-workers Joel Dyer ("Dyer"), Allan Rose ("Rose"), and Poulin stood beside her at a shift change; Poulin assumed a Hitler salute while Dyer and Rose called out "brother" and looked at Ramsdell.[9] (PSMF ¶¶19, 86.) Ramsdell reported that Dyer, who worked beside her, stared at her and smacked a clenched fist into the palm of his hand. (Id.)

On January 12, 2006, Ramsdell wrote a letter to Bates reporting that Poulin and another co-worker were "staring angrily" at her. (SMF ¶28.) Bates spoke with Ramsdell that same evening and told her that she had Bates' full support in working in an environment free from intimidation and hostility. Ramsdell thanked Bates for her support. On or about January 23, 2006, Bates met with Poulin, Barney, and Giguere. (Id. ¶30.) Poulin denied having stared at Ramsdell and asked why he was getting into trouble when he had originally complained about Ramsdell to Owens. Bates told Poulin he should not be in contact with Ramsdell and that she would hold Poulin responsible if any of his friends harassed Ramsdell. (Reply SMF ¶87; Exhibit G to Bates Affidavit (ECF No. 40-8) at 3.)

Around this time period, Ramsdell began keeping a journal of her alleged experiences while at work. While she wrote in her journals intermittently, she did not always write down all of the alleged harassment or retaliatory conduct she experienced because she did not like to write

---

[9] Huhtamaki denies Ramsdell ever made a complaint about Rose and also denies Ramsdell ever relayed these specific complaints regarding the shift change to Bates. Reply SMF ¶86. Additionally, Huhtamaki qualifies Ramsdell's "Hitler salute" allegation, stating Bates investigated each of Ramsdell's complaints but could not substantiate or find any merit to her allegations that a clique of people supported Poulin, nor could Bates uncover any evidence connecting these individuals' alleged conduct with Poulin or Ramsdell's 2004 complaint about Poulin. SMF ¶20, Reply SMF ¶86. Huhtamaki relies on this same qualification for many, if not all, of the complaints Ramsdell made to Bates. See generally SMF ¶¶88-96, 101-108, 110, 113, 118, 119, 121 & 122.

down things that embarrassed or overwhelmed her.  (SMF ¶29.)  By way of example, from 2006 until 2010, Ramsdell alleges Poulin would yell her name and walk away, or yell her name and look at her breasts and crotch.  (SMF ¶23.)  Ramsdell testified that happened once or twice a month, but not every month.  (Id.)  However, she documents this alleged behavior by Poulin only once during her journals for this time period.  (Id.)

Between Ramsdell's journals and the records compiled by Huhtamaki's Human Resources, there is a significant documentation of Ramsdell's complaints.  Viewing this record in the light most favorable to Ramsdell, the following incidents occurred between the middle of 2006 and the middle of 2007:[10]

> May 15, 2006: Ramsdell reported to Bates that co-workers Jill and Evelynn Blodgett were physically hostile toward her: one threw a stack of plates at the back of Ramsdell's feet and the other swung around and elbowed Ramsdell in the chest.  (PSMF ¶90.)

> May 25, 2006: Ramsdell complained to Bates that she was being ostracized by her co-workers.  (Id. ¶92.)

> June 30, 2006 - July 15, 2006:  Bates hired a private investigator who outfitted Ramsdell with a discrete personal videotaping device to wear during her shifts for a total of twelve hours.  (SMF ¶31.)  The purpose of the taping was to capture the behavior that Ramsdell was complaining about, namely, alleged harassment by other co-workers and Poulin hanging around Ramsdell.  Bates received a report from the private investigator that no incidents of harassment were captured on these video recordings on July 17, 2006.  Baker then believed that Ramsdell stopped using the device.  Ramsdell maintains that these recordings do show one incident in which a female co-worker brings boxes down from

---

[10] The Court notes that a number of Ramsdell's factual assertions regarding her complaints contain hearsay, state legal conclusions, or lack identifying information about to whom Ramsdell made a report.  The Court does not consider such inadmissible allegations but, instead, outlines those facts it does rely upon.

overhead and "seemingly intentionally let[s] them fall" near Ramsdell. (SMF ¶34 & PSMF ¶33.)

July 18, 2006:   Ramsdell wore the personal videotaping device at Huhtamaki and captured Poulin in her vicinity although the two were supposedly working different shifts.[11]  (SMF ¶35; PSMF ¶35; Ex. K to Bates Aff. (ECF No. 40-1).)  Ramsdell did not report this incident to Bates or provide the video to Huhtamaki until bringing her claim to the Maine Human Rights Commission.

July 19, 2006: Ramsdell indicated that she needed to go to the nurse but Darrel Castonguay ("Castonguay") would not get a co-worker to replace her. (Id. ¶104.)

August 23, 2006: Ramsdell met with Bates and Giguere and reported Poulin "hangs around" her and that he and other co-workers "stare" at her.  (SMF ¶37.)[12]

December 22, 2006: Ramsdell reported to Peter White ("White") and Schenks that co-worker Evelyn Blodgett deliberately struck her in the leg with a metal gate.  (PSMF ¶96.)

March 10, 2007: Ramsdell was made to clean an area where a fire had recently occurred that contained asbestos. (Id. at ¶99.)   Ramsdell claims that she was not provided proper safety equipment, nor was she instructed how to properly take care of the contaminated cleaning supplies she used.  (Id.)  Ramsdell reported this to Strickler, Giguere, Rough

---

[11] Notably, based on the times listed in the video, this incident of Poulin and Ramsdell being in the same vicinity appears to occur around a shift change.  However, Ramsdell maintains that under the protocol then in place it was her understanding that Poulin was being paid to leave early so that they would not be in the same place at the same time. (Ramsdell Dep. at 54-55.)

[12] Huhtamaki states that Bates and the Union representatives expressed their support of Ramsdell and told her to let them know if she needed assistance.  (SMF ¶37.)  However, upon reviewing Huhtamaki's record citation, it is evident that Huhtamaki incorrectly cited to Bates' July 25, 2007 notes.  Compare, Ex. G to Bates Affidavit (ECF No. 40-8) ("Exhibit G") at Page ID #763-764, with Exhibit G at Page ID #761.  Bates' August 23, 2006 notes support Huhtamaki's factual allegation regarding the substance of Ramsdell's report, but do not support the remainder of Huhtamaki's allegation.  To that end, Bates noted, "If Bonnie has problem – go to Shop Steward," and that "Ron constantly hangs around – this a.m., Scot Otis – Ron hit him – and both looked at her." Exhibit G at Page ID #761.

Finish Department Manager Walter Goodine ("Goodine"), and Safety Director Deb Works ("Works.") (Id.) Additionally, Ramsdell and a co-worker, Melanie Lemieux complained to Bates about being asked to clean up the area, Bates told Ramsdell and Lemieux that they did not have to clean if they were uncomfortable doing so. (Id.; Lemieux Dep. (ECF No. 35-1) at 35:15 – 36:17.)[13]

May 14, 2007: Ramsdell reported to Jason LaVerdiere ("LaVerdiere"), Strickler, and Goodine that co-worker Maryann Gilman aimed her vehicle at Ramsdell and nearly ran her over. (PSMF ¶101.)

All of these events culminated in a meeting on or about July 25, 2007 between Ramsdell, Bates, Barney, Giguere, and Goodine. (SMF ¶39.) Bates explained to Ramsdell that Poulin needed to be able to work free of any harassment and asked Ramsdell whether Poulin had violated the terms of his October 2004 written warning. (SMF ¶39.) Ramsdell stated that Poulin had not, and briefly left the meeting. (Id.) Upon her return, Bates asked Ramsdell what more management and the Union could do to address her concerns; Ramsdell responded that she did not want to "run into" Poulin. (Id. ¶40.) Bates inquired whether Ramsdell had, in fact, "run into" Poulin and Ramsdell responded she had not. (Id.) Bates explained that because Poulin had done nothing wrong for nearly three years, Huhtamaki was going to discontinue its practice of paying one of them to stay home instead of working available overtime. (Id.) Bates said it was

---

[13] Huhtamaki denies this allegation. Huhtamaki maintains that it hired an outside company to clean up after the fire and tests conducted by Northwest Test Consultants at Huhtamaki indicated that the asbestos levels present at the time were well below the Occupational Safety and Health Administration's standards for acceptable exposure levels. (Reply SMF ¶99.) Huhtamaki claims Ramsdell and Lemieux were not asked to clean the fire-afflicted area until March 27, 2007 – after the outside company had already cleaned it. (Id.)

possible that in the future Ramsdell and Poulin might briefly cross paths during shift change and when one of them worked available overtime.[14] Id.

The purported disharmony between Ramsdell and her co-workers continued. In 2008 and 2009, the following incidents and reports occurred:

July 31, 2008: Ramsdell reported to Strickler that Castonguay's cousin, Nicki Pelletier, walked off and would not fix Ramsdell's stackers when asked for assistance. (PSMF ¶105.)

August 12, 2008: Poulin and co-worker Randy Snow ("Snow") repeatedly walked past the break room window where Ramsdell was sitting in a manner that subjectively scared Ramsdell. (Id. at ¶106.)

August 26, 2008: Ramsdell reported to Higgins that the first hands again would not fix her stackers when they were broken (Id. ¶107.)

September 13, 2008: Ramsdell complained to Bates that co-worker Paul Grandmaison put a magazine containing allegedly pornographic pictures in front of her while she was working. (Id. ¶109.)

September 19, 2008: Ramsdell reported to Higgins that co-worker Al Grant would speed up her machine, swear at her on the floor, force her to do dirty clean-up jobs, and messed with the pick schedule so that Ramsdell would not be able to pick a machine based on her seniority. (Id. ¶110.)

---

[14] While essentially admitting what occurred at the July 25, 2007 meeting, Ramsdell qualifies the description of what was said, maintaining she "was not informed that Huhtamaki ceased prohibiting Ron Poulin to be in her vicinity in 2007." PSMF ¶40. The Court finds that Ramsdell's qualification and her deposition testimony are internally contradictory. See Ramsdell Dep. II 308:14-308:13. However, given Ramsdell's own admission that Bates told her the separation deal was over, the Court concludes that there is no trialworthy question that in 2007 Ramsdell was informed that Huhtamaki was no longer going to take extraordinary measures to prevent Ramsdell and Poulin from ever being at the mill at the same time. See PSMF ¶40 & Ramsdell Dep. at 307-08.

January 23, 2009: Ramsdell reported to John Perry that she was concerned that she was being moved to the A-shift directly opposite from Poulin (Id. ¶114.)

March 28, 2009: Snow approached Ramsdell, Gail Trafton ("Trafton"), and Jeanie O'Keefe ("O'Keefe") and said "I can stick my fucking dick into any one of you." (Id. ¶117.) Ramsdell was shaking and crying and told a supervisor, Rick Kennedy, that she was "on the shift from hell." Kennedy smiled and walked away. (PSMF ¶118.) On April 2, 2009, Ramsdell met with Bates, Mike Wadsworth ("Wadsworth"), and Castonguay regarding this incident. (Reply SMF ¶117.) At that meeting, Ramsdell indicated Snow used profanity. Id. One week later Huhtamaki issued Snow a written warning that required him to attend counseling. Id.

October 8, 2009: Ramsdell met with Bates, the Union's International Representative Luciene Deschaine ("Deschaine"), Huhtamaki Labor Counsel Jack Billick ("Billick"), Barney, Union Vice President Mike Higgins ("Higgins"), and Wadsworth. (SMF ¶44.) At that meeting, Ramsdell stated that Poulin and Snow were part of a clique. (Id.; Exhibit 5 to Bates Dep. (ECF No. 28-16 at 6).) Ramsdell reported that as Poulin was relieving her at a shift change, he stated "your relief is here." (SMF ¶44.) Ramsdell indicated another co-worker laughed when Poulin spoke to her. Id. Management and the Union asked if Poulin had done anything besides state that he was there to relieve her, and Ramsdell replied "no." Id. Ramsdell states that while she was speaking at the meeting, Bates and Barney rolled their eyes, PSMF ¶44, yet Bates specifically avers this did not occur. See ECF No. 54-1 at 2.

November 13, 2009: Ramsdell reported to John Perry ("Perry") that a "scarecrow," which had been built to look like a large-breasted woman, was left in her work area. The words,

"hey dumbass" were written on it.[15]  (PSMF ¶124.)  Immediately after the discovery of the scarecrow, it was taken down and Ramsdell and Lemieux were asked to report to Bates. (SMF ¶45 & PSMF ¶45.) Lemieux indicated she "didn't really like being called [there] because it looked like, you know, I was – I had reported this or I didn't want to be, you know, singled out like Bonnie ha[d] been. [Bates] said: Well, then I'll call everybody down." (Lemieux Dep. (ECF No. 35-1) at 33:12-18).   Bates interviewed all of the employees who were working in the area of the scarecrow that day, but was unable to determine where it came from. (SMF ¶45.)

Later that evening, Ramsdell heard what she believes was a high-powered rifle shot outside of her home.  Ramsdell believed the gunshot was related to her reporting the scarecrow.  (PSMF ¶125.) She reported the alleged shot to the police, Bates and Barney.[16] (Id.)

November 18, 2009: Shift Supervisor Dan Wilson ("Wilson") complained to Bates that Ramsdell walked off the job. (SMF ¶48.)  That same day, Bates and several Union representatives spoke with Ramsdell; Ramsdell told the group she had left because she was afraid of seeing Poulin at shift change and started to have an anxiety attack. (Id. & PSMF ¶48.)

In the Fall of 2009, Ramsdell first sought out an attorney concerning what she perceived to be illegal conduct at Huhtamaki.  (SMF ¶49; Ramsdell Dep. II at 228:6-9.)  At her deposition, Ramsdell testified:

---

[15] Huhtamaki qualifies this allegation, indicating Douglas testified the scarecrow was an in-joke between two co-workers and that the scarecrow "had nothing to do with [Ramsdell.]" (Reply SMF ¶124.)

[16] Huhtamaki qualifies this allegation, noting Ramsdell testified she had never previously heard the sound of a high-powered rifle shot and that the sound occurred during hunting season.  (Reply SMF ¶125.)

> I was afraid of what was happening to me at work. I was petrified of going to work every day and I needed to hear that I wasn't crazy. And by talking to a lawyer – I wasn't going to a lawyer to say: Hey, can you represent me? I want to bring these people to court. I went to him to tell him what was happening to me at Huhtamaki because I wanted to know if it was normal for these things to happen in a factory, because my past experience I had no past experience of anything like this happening. The things that were being said to me, I felt were illegal and that's why I went to see him.

(Ramsdell Dep. II at 228:13-24.)

Ramsdell was out on vacation from February 1, 2010 through February 12, 2010. On February 18, 2010, Huhtamaki asked Poulin to work overtime and to help cover for employees taking breaks on the stacker line. (SMF ¶52.) After beginning her shift as a relief person, Ramsdell saw Poulin in the break room and believed Poulin was glaring at her. (Id. ¶53; PSMF ¶53; Ramsdell Dep. II at 299:14-24.) Ramsdell indicates that later, while at her machine, she saw Poulin and Castonguay staring at her malevolently from the office window. (PSMF ¶53.) Ramsdell then left the stacker line to seek help from union officials Kelly Burnell ("Burnell") and Schenks because she was beginning to experience symptoms of an anxiety attack.[17] (PSMF ¶53; see also Ramsdell Dep. II at 299:16-24) ("Q: So, you left your station not on an authorized break, not on lunchtime. You left your station in the middle of your shift? A: No, I'm the relief person, the shift is just starting. I don't start giving breaks until 20 after 6:00. So, as I go out to the machine, I've still got five minutes, so I go down and talk to Kelly. I come up and send out Jeannie O'Keefe on break. Jeannie O'Keefe and I don't know who else. Some guy was on the machine.") Ramsdell returned to her work station, but soon left because she continued to be upset by Poulin's presence. (SMF ¶53; see also Ramsdell Dep. II Page ID #582, 301:11-302:8) (Wherein Ramsdell testifies co-worker Judy Trumell relieved her on the line so she could speak with Schenks; Ramsdell asked Schenks if Poulin would be working with her and, if so, stated she

---

[17] While agreeing that Ramsdell left the slacker line, Huhtamaki asserts that Ramsdell left to determine whether Poulin was going to work at the same time as her. (SMF ¶53.)

wanted to go home.)  Ramsdell then again returned to the line.  Ramsdell denies that these departures from her work station on February 18, 2010, caused a disturbance on the line.  (PSMF ¶53.)  However, she admits that she suffered anxiety attacks when she was in Poulin's presence, and that his mere presence at the mill was "harassing" to her.  (PSMF ¶¶54 & 55.)

Ramsdell worked until she was called down to the Human Resources office around 8:20 p.m., and met with Bates and Higgins.  (SMF ¶56; Ramsdell Dep. II at 303:12-17)  Bates told Ramsdell that Poulin had the right to perform his job duties free of harassment, just like every other employee.  (Id.)  Bates reviewed the many occasions when both the Union and management had met with Ramsdell to investigate and review her concerns about working with Poulin, and reminded Ramsdell that there was no evidence that Poulin had behaved at all inappropriately since Huhtamaki issued him the 2004 written warning.  (Id.)  Higgins told Ramsdell that the Union had an issue with her credibility because her complaints continued to be meritless.  (Id.)  Higgins told Bates that the Union would agree to a one-week suspension rather than termination; Bates then explained to Ramsdell that Huhtamaki was suspending her for one week for causing a disruption on the line.  (Id.)  Ramsdell claims that Bates told her that if, after returning to work, Ramsdell seemed upset by anyone just once, she would be terminated.[18] (PSMF ¶139.)

On or about February 25, 2010, Ramsdell requested a medical leave of absence and indicated she anticipated returning on May 24, 2010.  (JSF ¶14.)  Huhtamaki granted Ramsdell's request, but Ramsdell did not return on that date.  (Id. ¶¶14 & 15.)  A Huhtamaki nurse called Ramsdell on May 28, 2010, to determine when she would return to work.  (Id. at ¶15.)

---

[18] Huhtamaki denies this, citing to Bates' supplemental affidavit wherein she avers, "I did not tell Ms. Ramsdell that she would be terminated if she returned to Huhtamaki after her one-week suspension and still was upset by her co-workers. In fact, I did not even mention employment termination during the meeting with Ms. Ramsdell." Reply SMF ¶139; Supp. Affidavit of Beth Drennan-Bates (ECF No. 54-1) ("Bates Supp. Aff.") ¶8.

Ramsdell's attorney indicated she would be out of work indefinitely. (Id.) On December 15, 2010 – 300 days after her last day at work, Ramsdell filed a Charge of Discrimination against Huhtamaki with the Maine Human Rights Commission ("MHRC") and the United States Equal Employment Opportunity Commission ("EEOC"). (Id. ¶16.) Since she was suspended, Ramsdell has not worked on advice of her doctors. (PSMF ¶131.) She suffers from nightmares and a general fear of being around men. (Id.) Based on a comprehensive psychiatric evaluation, Ramsdell has been diagnosed with major depressive disorder, panic disorder with agoraphobia, anxiety disorder and psychotic disorder. Her psychiatrist, Dr. David J. Bourne, has opined that her current mental health issues began while working at Huhtamaki. (PSMF ¶130.)

## III. DISCUSSION

Ramsdell's Amended Complaint (ECF No. 11) pled two separate counts. Count I alleged sexual harassment in violation of both 42 U.S.C. § 2000-e(2)(a) and 5 M.R.S.A § 4572. Count II alleged unlawful retaliation in violation of both 42 U.S.C. § 2000-e(3) and 5 M.R.S.A. § 4633. On June 6, 2013, Plaintiff voluntarily dismissed Count I to the extent that it alleged a sexually-based hostile work environment claim. (See Notice of Dismissal (ECF No. 27).) Thus, Ramsdell now seeks relief only under the anti-retaliatory provisions of Title VII of the Civil Rights Act of 1964 and the Maine Human Rights Act.[19] Defendant's Motion primarily challenges the timeliness of Ramsdell's claim and alternatively argues that any timely claim is not trialworthy. The Court begins its analysis with a brief sketch of what is required to state a valid and timely anti-retaliation claim and then considers whether Plaintiff's claim can meet those requirements.

---

[19] To the extent Plaintiff states her retaliation claim under state and federal law, the same analysis applies and the Court considers the state and federal claims concurrently without laying out a separate analysis of Plaintiff's MHRA claim. See, e.g., Bodman v. State of Maine, 787 F. Supp. 2d 89, 99 n.14 (D. Me. 2011).

## A. Legal Requirements for a Valid & Timely Anti-Retaliation Claim

Title VII, in relevant part, makes it illegal "for an employer to discriminate against any of [its] employees… because [she] has opposed any practice made unlawful… or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under that law. 42 U.S.C. § 2000e-3(a). Similarly, the Maine Human Rights Act makes it unlawful for a person to "discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S.A. § 4633.

Generally, "[t]o engage the gears of [42 U.S.C.S. § 2000e-3(a)], a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked. Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). The First Circuit has ruled that establishing a prima facie case of retaliation is a "relatively light burden." Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007). "[I]n determining whether conduct is protected opposition—the first step, a court must balance the setting in which the activity arises and the interests and motivations of both employer and employee." Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 232 (1st Cir. 1976); cf. Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003) ("[T]he employment activity or practice that [plaintiff] opposed need not be a Title VII violation so long as [plaintiff] had a reasonable belief that it was, and [s]he communicated that belief to [her] employer in good faith."). To satisfy the second element, the action taken must be "materially adverse" such that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Finally, with respect to the third causation element of the prima facie case, the Supreme Court has held that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under [42 U.S.C.] § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, ___U.S.___, 133 S. Ct. 2517, 2534 (2013). If all three elements of the prima facie case are established on the summary judgment record, a retaliation claim is then examined under the familiar McDonnell Douglas burden-shifting framework. See Green v. Maine Sch. Admin. Dist. 77, 52 F. Supp. 2d 98, 109 (D. Me. 1999).

The First Circuit has explicitly held that "workplace harassment, if sufficiently severe or pervasive, may in and of itself . . . satisfy the second prong of the prima facie case for Title VII retaliation cases." Noviello, 398 F.3d at 89. However, as the First Circuit has noted, "discrete acts and hostile work environment claims are 'different in kind,'. . . because hostile work environment claims by their nature involve repeated conduct and a single act of harassment may not be actionable on its own." Johnson v. Univ. of Puerto Rico, 714 F.3d 48, 53 (1st Cir. 2013) (quoting and citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)). Because of these differences, the Supreme Court has stressed "the need to identify with care the specific employment practice that is at issue," particularly when determining whether a plaintiff has filed a timely claim under Title VII. Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 624 (2007) (citing Morgan, 536 U.S. at 110-110, *superseded in part by statute,* Lilly Ledbetter Fair Pay Act of 2009, Pub.L. No. 111–2, 123 Stat. 5. Under both Title VII and the Maine Human Rights Act, a timely claim of retaliation must be filed not more than 300 days after the alleged unlawful employment practice occurred. See 42 U.S.C. § 2000e-5(e)(1); 5 M.R.S.A. § 4611.

In the Court's view, the specific employment practices at issue here are: (1) Ramsdell's suspension on February 18, 2010; (2) the alleged threatened termination of Ramsdell on February 18, 2010;[20] and (3) the retaliatory hostile work environment which Ramsdell claims she experienced between October 2004 and February 18, 2010 (the last day she worked in the Huhtamaki facility). The first two practices, suspension and threat of termination, are easily identified as "discrete acts." Morgan, 536 U.S. at 101. In the Court's view, either suspension or a supervisor's threat of termination for any future complaint qualifies as the type of action that would dissuade a reasonable employee from reporting violations of Title VII. Thus, the Court proceeds to consider whether Ramsdell's claim may proceed based on either her alleged discrete acts of retaliation, or her alleged retaliatory hostile work environment, or both.

**B. Discrete Acts of Retaliation: Suspension & Threat of Termination**

**1. Timeliness**

Because Ramsdell filed her Charge of Discrimination with the MHRC and the EEOC on December 15, 2010, the 300-day look back period establishes a cut-off date of February 18, 2010, which was Ramsdell's last day working as a stack operator at Huhtamaki. It was also the day she was suspended and allegedly threatened with termination if she made any further complaints.

With respect to the discrete acts of suspension and threatened termination, the Court readily finds that Ramsdell filed a timely claim because these adverse actions occurred within 300 days of filing of her claim. See, e.g., Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 157 (2d Cir. 2012) (explaining that post-Morgan, every circuit to consider the question has held that "discrete acts" must fall within the limitations period and discrete acts outside the

---

[20] The Court recognizes that whether Ramsdell was actually threatened with termination on February 18, 2010 is an issue that would be contested at trial with the fact finder being required to weigh the credibility of Ramsdell, Bates, and any other participants in the meeting.

limitations period cannot be considered even if the acts result from the same longstanding policy or practice), cert. denied, 133 S. Ct. 1724 (2013).  As the Supreme Court explained in Morgan: "The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after *the unlawful practice* happened."  Id. at 117 (emphasis added). Defendant's suggestion that the 300-day limit somehow prohibits Plaintiff from using any evidence of events occurring outside the 300-day window to establish the alleged basis for the retaliatory act incorrectly conflates time limits with evidentiary limits.  To the extent that Ramsdell claims these two discrete actions were taken in retaliation for her prior complaints of a retaliatory hostile work environment, she is not barred "from using the prior acts as background evidence in support of a timely claim."  Morgan, 536 U.S. at 113.

### 2. Trialworthiness

Having determined that this is a timely claim, the Court proceeds to consider the merits of Ramsdell's discrete acts of retaliation under the well-known McDonnell Douglas' burden-shifting framework.  To establish a prima facie case of retaliation based on her February 18, 2010 suspension and threatened termination, Ramsdell must show that "(1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the protected activity and the adverse employment action were causally connected."  Lockridge, 597 F.3d at 472.  If Ramsdell carries her light burden of establishing a prima facie case of retaliation, then the even lighter burden shifts to Huhtamaki of putting forward a legitimate, non-retaliatory explanation for suspending her.  This is merely a burden of production, not persuasion, as the burden of proving retaliation or discrimination always remains with Ramsdell. See Lacadie v. Town of Milford, 2008 U.S. Dist. LEXIS 35987 (D. Me. 2008) (citing Lewis v. City of Boston, 321 F.3d 207, 214 (1st Cir. 2003)).  Should Huhtamaki put forth a legitimate

explanation for the suspension, Ramsdell must present evidence that Huhtamaki's justification for suspending her was merely a pretext for retaliation; evidence, in other words, that the justification is unlikely to be true, such as will make it a fair inference that retaliatory animus was the real motivation for her termination. Id.

Here, there is no dispute that Ramsdell had a well-documented history of reporting sexual harassment and retaliation at Huhtamaki. There is also no dispute that, at minimum, her suspension was an adverse employment action. Reading the entire record in the light most favorable to Plaintiff, the Court also finds that there is a causal connection between Ramsdell's protected reports of sexual harassment and retaliation and her suspension and threatened termination.[21] The Court also finds that Huhtamaki has put forward a legitimate, non-retaliatory explanation for the suspension; namely, Ramsdell had disrupted the line. Thus, the burden shifts back to Ramsdell to present evidence that this explanation is pretext. Notably, Defendant admitted that during the February 18, 2010 meeting that conversation was not limited to the alleged line disruption and what had occurred that day. Rather, according to Defendant, the conversation included discussion about Poulin, the 2004 written warning, and the "many occasions" Ramsdell's complaints had been the subject of previous meetings. This admission supports Ramsdell's view that her suspension and threat of termination were not simply motivated by a line disruption on February 18, 2010. Moreover, Ramsdell disputes that there was any line disruption and claims her suspension was accompanied by a threat that she would be terminated for making any further reports. These facts meet Plaintiff's burden of showing that Huhtamaki's "line disruption" explanation is pretextual. Additionally, the Court notes that

---

[21] However, the Court notes that given the apparent disputes in the factual record Plaintiff may not be successful in establishing a causal connection by a preponderance of the evidence at trial. Rather, a reasonable fact finder may well find that the proximate cause of Plaintiff's suspension and threatened termination was Ramsdell's objectively unreasonable reaction to Poulin's presence and alleged glares on February 18, 2010 and the resulting workplace disruption that Defendants allege occurred.

the record is replete with other instances in which Ramsdell complained of co-worker behavior that would appear to disrupt line operations yet there is no other evidence in the record of co-workers who were subject to one week suspensions for a single incident of line disruption. Therefore, the Court concludes that Plaintiff's claim is trialworthy and can survive summary judgment to the extent she has relied on the discrete acts of suspension and threatened termination.

The Court next turns to Plaintiff's apparent alternative theory: retaliatory hostile work environment culminating in her constructive discharge.

## C. Retaliatory Hostile Work Environment

### 1. Timeliness

Turning to the retaliatory hostile work environment which Ramsdell claims she experienced between October 2004 and February 18, 2010, Ramsdell encounters an apparent timeliness problem. Looking only at February 18, 2010, Ramsdell cannot state a trialworthy retaliatory hostile work environment claim. On that date, Ramsdell was present at the workplace for less than four hours. Viewing the record in the light most favorable to Ramsdell, during that time Poulin was also present in the workplace and Poulin and Castonguay stared and glared at her. Quite simply, these factual allegations alone cannot support a trialworthy retaliatory hostile work environment claim. See, e.g., Noviello, 398 F.3d at 93 (noting that "rudeness" and "commonplace indignities typical of the workplace" are not sufficient to support a claim for retaliatory hostile work environment).

Recognizing this issue, Plaintiff invokes an equitable tolling provision known as the "continuing violation doctrine," which, if applicable, would allow her to rely on the untimely acts of retaliation that occurred before February 18, 2010. The continuing violation doctrine is

an equitable exception to Title VII's 300-day time limit and "allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 474 (1st Cir. 2010); see also Morgan, 536 U.S. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.")  As the First Circuit has explained,

> The classic example of a continuing violation is a hostile work environment, which 'is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' Morgan, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)).  The continuing violation doctrine applies in that setting because hostile work environment claims by '[t]heir very nature involve[ ] repeated conduct,' and 'a single act of harassment may not be actionable on its own.' Id. at 115; see also Ledbetter v. The Goodyear Tire & Rubber Co., 550 U.S. 618, 127 S.Ct. 2162, 2175 (2007) ("[A] hostile work environment claim 'cannot be said to occur on any particular day' " because "the actionable wrong is the environment, not the individual acts that, taken together, create the environment." (quoting Morgan, 536 U.S. at 115–116)).  Thus, "component acts" of a hostile work environment claim that occur outside the filing period may be considered for purposes of determining liability. Morgan, 536 U.S. at 117.

Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009).

For the continuing violation doctrine to apply, Ramsdell must first establish that a retaliatory "anchoring" act occurred within the limitations period.  Noviello, 398 F.3d at 86; see also Cordero-Suarez v. Rodriguez, 689 F.3d 77, 83 (1st Cir. 2012) ("[A]lthough the continuing violation doctrine can render otherwise time-barred conduct actionable, the doctrine still requires some anchoring violation within the limitations period.")  Next, Ramsdell must prove "the alleged timely [retaliatory] act has a substantial relationship to the alleged untimely [retaliatory] act[s], and [that] the otherwise time-barred events did not trigger [her] awareness and duty to assert [her] rights." Windross v. Barton Protective Servs., 586 F.3d 98, 103 (1st Cir. 2009)

(internal citations omitted).  Ramsdell's awareness and duty was triggered, if at all, when she "knew or could have formed a reasonable belief that the earlier violations were [retaliatory]." Id. (internal quotations and citations omitted).

As to the first requirement, it is far from clear that glaring and mere presence can serve as anchoring events.  While the Court readily acknowledges that these actions were subjectively offensive to Ramsdell, it is not apparent that these two actions standing alone can qualify as objectively offensive.  Rather, it would appear that the actions of Poulin and Castonguay fall under the category of "rudeness or ostracism" that are unfortunately "commonplace indignities typical of the workplace." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).  To the extent that Plaintiff attempts to use her suspension and threatened termination as anchoring acts, the Court has already found that these two actions are discrete acts which are directly attributable to Huhtamaki.  Thus, the Court declines Plaintiff's invitation to consider her suspension and threatened termination as not only discrete acts but also as the timely anchors for her claim that she endured a hostile work environment from October 2004 through February 18, 2010.

Assuming for the moment that Plaintiff had an adequate anchoring act or that Plaintiff is entitled to rely on any act that is subjectively offensive to anchor her claim, Ramsdell can satisfy the second "substantial relationship" prong given Poulin's direct involvement.  However, in the Court's view, Plaintiff hits an insurmountable hurdle on the third prong: whether the time-barred events triggered her awareness and duty to assert her rights.  As in Windross, Ramsdell stated in her deposition testimony that she understood she was being retaliated against at several different points during her employment with Huhtamaki.  (See Ramsdell Deposition Volume I (ECF No. 29) ("Ramsdell Dep. I") at 86:19 − 88:5) (Wherein Ramsdell testifies that there were certain categories of conduct committed by Poulin and other co-workers that she felt

were harassing in nature); <u>see</u> <u>also</u> Ramsdell Dep. I at 91:21-92:6.) Moreover, the record is replete with instances in which Ramsdell complained to her employer and the Union about actions that she felt were tied to Poulin over a six year period. Additionally, the harassing conduct motivated Ramsdell to seek out an attorney in Fall 2009. (Ramsdell Dep. II at 228:19-24 (Ramsdell explains, "what was happening to me at Huhtamaki… [t]he things that were being said to me, I felt were illegal and that's why I went to see him.")). Ramsdell also was advised during the July 25, 2007 meeting that Huhtamaki was no longer going to continue its prior extraordinary actions to separate Poulin and Ramsdell. To the extent that Ramsdell felt that Huhtamaki had a continuing obligation to prevent Poulin from being in her vicinity based on the resolution of the Walters investigation, Ramsdell could have pursued a claim well before she filed her Charge of Discrimination on December 15, 2010. Given all of these events, the Court concludes that Ramsdell had ample triggers prior to February 18, 2010 to prompt her to pursue a retaliatory hostile work environment claim but, by all accounts, chose not to pursue such a claim.

Thus, on the record, the Court is inclined to conclude that Ramsdell is not entitled to rely on the continuing violation doctrine to pursue her claim under the theory that she experienced a retaliatory hostile work environment prior to February 18, 2010. However, in an abundance of caution, the Court considers whether such a claim could survive summary judgment on the merits.

## 2. Trialworthiness

An analysis of Ramsdell's claim that a retaliatory hostile work environment at Huhtamaki forced her constructive discharge begins with the prima facie case. Thus, Ramsdell must show that (i) she undertook protected conduct, (ii) she suffered a materially adverse employment action, in this case a retaliatory hostile work environment, and (iii) the two were causally linked.

See Noviello, 398 F.3d at 88-89 (explicitly noting that "a hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action for purposes of 42 U.S.C. § 2000e-3(a)"). There is no dispute that Ramsdell undertook protected conduct. Rather, the focus is on the remaining two elements.

As explained by the First Circuit in Noviello, in order for harassment and retaliation by a co-worker to rise to the level of a hostile work environment, it must be "sufficiently severe and pervasive." Id. Under this standard,

> The harassment must be objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment.

Id. at 92 (internal quotations & citations omitted). Likewise, the "hostile work environment calculus" considers "only those actions, directed at a complainant, that stem from a retaliatory animus." Id. at 93. "Actions that are hurtful to a complainant only because coworkers do not take her side in a work-related dispute may not be considered as contributing to a retaliatory hostile work environment." Id.

As the Court has previously noted, there is ample evidence to support Ramsdell's claim that she found her co-workers' conduct to be subjectively offensive and retaliatory. Whether a reasonable fact finder would find the alleged pattern of conduct retaliatory is a more difficult question that inevitably turns on credibility determinations and weighing disputed testimony. As a result, the Court simply cannot resolve this question on summary judgment. The parties dispute much of the relevant conduct, particularly with respect to whether retaliation motivated

that conduct.  Having concluded that there is a trialworthy issue as to whether that conduct was objectively severe and pervasive, the Court turns to the third element, causal connection.  The Court assumes Plaintiff could meet her initial burden of putting forth evidence of a causal connection and likewise assumes that Defendant can overcome the burden shift based on the evidence in the record showing that the work environment reflected many non-protected complaints Plaintiff made between October 2004 and February 2010.  Thus, the burden shifts back to Plaintiff.

At trial, Ramsdell would be required to prove that but-for her *protected* complaints she would not have experienced such an objectively "intolerable" hostile work environment.  See Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 25 (1st Cir. 2013)  ("Constructive discharge typically refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable.")  (internal quotation marks and citation omitted).  First, the Court notes that it is difficult, if not impossible, to discern how much of Plaintiff's work environment was the result of reports protected under Title VII versus non-protected reports.  Second, the current record would not allow a reasonable fact finder to readily conclude that the work environment was objectively intolerable in early 2010.  Moreover, no reasonable fact finder could conclude that a retaliatory hostile work environment was the but-for cause of the claimed constructive discharge in this case.  Rather, to the extent that a fact finder might conclude that Ramsdell's was constructive discharged, the only reasonable inference is that the proximate cause of the constructive discharge was the actions taken by Huhtamaki on February 18, 2010.  In opposing summary judgment, Plaintiff herself argues that she "was not compelled to complain to the EEOC or MHRC until *after she was suspended and threatened with dismissal*."  (Pl. Response at 14 (emphasis added).)  Until Huhtamaki took those two specific

actions on February 18, 2010, Ramsdell "consistently asserted her rights to Huhtamaki . . . in accordance with employer policy."[22] In fact, the record shows that Huhtamaki went to great lengths to address the complaints made by Ramsdell, who was apparently often satisfied with the results of that process.

In light of that record of responsiveness, Huhtamaki additionally argues that it is entitled to summary judgment on Plaintiff's retaliatory hostile work environment claim because it acted to prevent retaliation and to correct any retaliation reported by Ramsdell. In short, Huhtamaki argues that Ramsdell cannot prove that Huhtamaki was negligent either in discovering or remedying any retaliation that Ramsdell experienced. See, e.g., Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 40 (1st Cir. 2007) ("An employer's liability for a hostile work environment claim depends on the harasser's employment status relative to the victim's . . . if a co-worker created the hostile work environment, [the employer] will be held liable only if it was negligent either in discovering or remedying the harassment.") (internal citations omitted). Rather, Huhtamaki asserts that it took "prompt and appropriate" action to address Ramsdell's complaints of retaliation and to prevent further retaliation. See Forrest v. Brinker Intern. Payroll Co., 511 F.3d 225, 230-31 (1st Cir. 2007). Even viewing the factual record in the light most favorable to Plaintiff, the Court concludes that Huhtamaki took the necessary prompt and appropriate action on Ramsdell's complaints prior to February 18, 2010. As a result, as a matter of law, the Court concludes that liability may not attach to Huhtamaki for those complaints.

In reaching this conclusion, the Court recognizes that the First Circuit has noted that "what constitutes a 'prompt and appropriate' employer response to allegations of sexual

---

[22] This assertion further supports the conclusion that the hostile work environment, to the extent it existed, did not actually dissuade Ramsdell from making complaints. Thus, it is questionable whether the retaliatory hostile work environment presented here actually rises to the level of creating a "materially adverse" work environment as required under the prima facie case for retaliation.

harassment often requires the sort of case-specific, fact-intensive analysis best left to a jury." Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 232 (1st Cir. 2007). However, in this case the undisputed record shows Huhtamaki went to great lengths to separate Ramsdell from Poulin for almost three years. Bates quickly resolved Ramsdell's particular complaints to the extent she found they were substantiated and went so far as to outfit Ramsdell with a personal videotaping device to record activities she was unable to substantiate. Unlike most cases in which the plaintiff disputes the human resources administrator's responsiveness, Ramsdell does not dispute that she had a constructive relationship with Bates up until February 18, 2010. Thus, the Court finds no reasonable jury could conclude that Huhtamaki failed to promptly and appropriately prevent retaliation and respond to Ramsdell's complaints of retaliation prior to February 18, 2010.

To summarize, the Court grants Defendant summary judgment on Plaintiff's claim to the extent she seeks to recover on the theory that a retaliatory hostile work environment led to her constructive discharge. In the Court's assessment, this claim does not qualify for application of the continuing violation doctrine and, thus, is untimely. Alternatively, the Court holds that Plaintiff has failed to present a trialworthy claim of constructive discharge based on hostile work environment. Additionally, the Court concludes that Defendant has established by a preponderance of the undisputed evidence that its prompt and appropriate actions prior to February 18, 2010 qualify for the Faragher–Ellerth defense to Plaintiff's claims of retaliatory hostile work environment. See Chaloult v. Interstate Brands Corp., 508 F. Supp. 2d 103, 107 (D. Me. 2007).

### D. Punitive Damages

Huhtamaki also seeks summary judgment on Ramsdell's request for punitive damages, arguing she cannot meet her burden of proving Huhtamaki engaged in discriminatory conduct in the face of a perceived risk that it was violating the law, or that it acted with malice or reckless indifference. To that end, Huhtamaki states "the facts of this case demonstrate that Huhtamaki fully investigated all of Ramsdell's complaints, and, where necessary, took prompt and effective corrective action. (SMF ¶¶ 20, 30, 31-35, 37, 38, 42, 43, 44, 45). Ramsdell also has not submitted *any* evidence demonstrating that Bates – who made the decision to suspend her – acted maliciously in making that decision or had any personal animus toward Ramsdell." (Def's Mot. for Summary Judgment, (ECF No. 38) at 34–35). Ramsdell maintains that Huhtamaki acted with "reckless indifference" by virtue of suspending her "for having a panic attack" and threatening to terminate her "if she showed that she was upset by any act of a coworker because they did not find her complaints credible." (Pl.'s Resp., (ECF No. 47) at 23-24). Ramsdell adds that Huhtamaki, an educated and sophisticated employer, made this threat "knowing that [she] had been the victim of past sexual harassment." Id. at 24.

Punitive damages are available in connection with Title VII claims when a defendant employer has engaged in unlawful intentional discrimination. 42 U.S.C. § 1981a(a)(1). In order to recover, a plaintiff must show that the defendant "engaged in a discriminatory practice... with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The standard is the same under the Maine Human Rights Act. 5 M.R.S.A. § 4613(2)(B)(8)(c); Davis v. Emery Worldwide Corp., 267 F. Supp. 2d 109 (D. Me. 2003). The Supreme Court rejected the idea that "that eligibility for punitive damages can only be described in terms of an employer's 'egregious' misconduct." Kolstad v. American Dental

Ass'n, 527 U.S. 526, 535 (1999). Rather, the terms "malice" and "reckless indifference" ultimately focus on the actor's state of mind. See id. at 534-35. Accordingly, the Court must determine whether Huhtamaki engaged in the conduct alleged with the "knowledge that it may be acting in violation of federal law." Id. at 535. "An employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." Id. at 536. While egregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive, the presence (or absence) of such acts does not in itself determine the propriety (or lack of propriety) of punitive damages in a given case. See Iacobucci v. Boulter, 193 F.3d 14 (1st Cir. 1999). "Evidence that suffices to establish an intentional violation of protected civil rights also may suffice to permit the factfinder to award punitive damages." Merriweather v. Family Dollar Stores, 103 F.3d 576 (7th Cir. 1996).

Neither party disputes that Bates was acting within the scope of her "managerial capacity," Kolstad, 527 U.S. at 543 (citations omitted), on February 18, 2010 when she suspended Ramsdell and allegedly threatened her with termination. The Court concludes the instant record contains sufficient evidence to create an issue of material fact concerning whether Huhtamaki, through Bates, retaliated against Ramsdell with reckless indifference to her rights. As indicated above, the Court has concluded that Ramsdell has a trialworthy record with respect to pretext in connection with Huhtamaki's proffered explanation for her suspension—that she had created a disruption on the line. Huhtamaki does not claim that Bates' actions on February 18, 2010 violated any company policy; that she was not acting within the scope of her employment; nor that it has ever disavowed Bates' conduct. See, e.g. Kolstad 527 U.S. at 552. (Stevens, Souter, Ginsburg, and Breyer, concurring in part and dissenting in part). Neither Huhtamaki nor Bates claimed any ignorance of Title VII's requirements. Id. The record, in sum,

contains evidence from which a jury might find that Huhtamaki acted with reckless indifference to Ramsdell's Title VII rights with respect to the discrete acts of discrimination the Court has concluded survive Huhtamaki's motion for summary judgment. Therefore, to the extent that Count II survives summary judgment, the Court concludes that Plaintiff's claim for punitive damages also survives summary judgment.

## IV. CONCLUSION

In many cases involving employment discrimination, "where elusive concepts such as motive or intent are at issue," summary judgment fails as a procedural vehicle for resolving the entirety of the parties' dispute. <u>Luciano v. Coca-Cola Enters., Inc.</u>, 307 F. Supp. 2d 308, 317 (D. Mass. 2004) (internal quotation omitted) (noting summary judgment is "not a favored tool" in these circumstances). This is one such case. The Court concludes that Plaintiff may not proceed to trial on her theory that she was subjected to a retaliatory hostile work environment prior to February 18, 2010 and that the environment caused her constructive discharge. However, the Court also concludes that Plaintiff has presented a trialworthy claim for retaliation based on the suspension and threat of termination she experienced on February 18, 2010. In presenting this later theory to a jury, Plaintiff will not be categorically barred from presenting evidence of relevant events that occurred prior to February 18, 2010. Finally, the Court concludes that Plaintiff may proceed with a claim for punitive damages as to the discrete retaliatory acts of suspension and threat of termination.

As explained herein, the Court GRANTS IN PART & DENIES IN PART Defendant's Motion for Summary Judgment (ECF No. 39). As noted in the Court's May 31, 2013 Procedural Order (ECF No. 26), within five days counsel for Defendant shall arrange for a telephone

conference with the Magistrate Judge to establish a limited scheduling order extension for the sole purpose of taking expert depositions. After the conclusion of these depositions, this case shall be placed on the next available trial list.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 15th day of January, 2014.